IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| SHIRLEY LATTIG,<br><br>Plaintiff,<br><br>vs.<br><br>WINTERSET MADISIONIAN INC., D/B/A THE SHOPPER AND TED GORMAN,<br><br>Defendants. | ) | NO. 4:09-cv-00197-RAW<br><br>RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

The above resisted motion [9] is before the Court. Plaintiff, Shirley Lattig, filed a complaint on May 15, 2009 asserting employment discrimination and retaliation on the basis of age, sex, and (though not completely clear)[1] disability against her former employer, Winterset Madisionian Inc., and its owner and general manager, Ted Gorman. Ms. Lattig sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as well as the Iowa Civil Rights Act (ICRA), Iowa Code Ch. 216.

Defendants filed a Motion for Summary Judgment [9]. In support of their motion, Defendants' submitted a Memorandum of Authorities [9-1] and a Statement of Undisputed Facts, including exhibits [9-2]. In response, Ms. Lattig filed a Resistance [10].

---

[1] The Introduction to the Complaint describes Ms. Lattig's action as one for sex, age and "health discrimination." (Complaint [1] at 1). Counts I and II are captioned as asserting, respectively, ICRA and Title VII claims for "SEX AND AGE DISCRIMINATION AND RETALIATION" though "disability discrimination" is alleged in the body of each count. (*Id.* at 3-4).

In support of her resistance, Ms. Lattig filed a Statement of Disputed Facts and a Brief [10-1]. Ms. Lattig did not respond to Defendants' Statement of Undisputed Facts. Defendants filed a Reply to Plaintiff's Resistance [11] and a Response to Plaintiff's Statement of Disputed Facts [11-1]. The case was referred to the undersigned for all further proceedings pursuant to 28 U.S.C. § 636(c). The Court has federal question and civil rights jurisdiction under 28 U.S.C. §§ 1331, 1343(a) and supplemental jurisdiction of the ICRA claims under 28 U.S.C. § 1367(a). The matter is fully submitted and the Court rules as follows.

## I.

## SUMMARY JUDGMENT

A party is entitled to summary judgment if the affidavits, pleadings, and discovery materials demonstrate "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Roeben v. BG Excelsior Ltd. Partnership*, 545 F.3d 639, 642 (8th Cir. 2008); *see EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 991 (8th Cir. 2006); Fed. R. Civ. P. 56(c). The Court must view the facts in the light most favorable to the party resisting summary judgment, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.*, 266 F.3d 884, 885-86 (8th Cir. 2001)(citing *Sprenger*

*v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001)); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Howard v. Columbia Public Schl. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004)("unreasonable inference or sheer speculation" not accepted as fact). The resisting party must "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir. 1999). "While we review the record in the light most favorable to ... the non-moving party, we do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay." *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001); Fed R. Civ. P. 56(e). "In evaluating the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence." *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996).

Our local rules contain some procedural requirements for summary judgment proceedings. Among them is a requirement that "[a] party resisting a motion for summary judgment must, within 21 days after service of the motion, file contemporaneously all of the following: ... A response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact." LR 56.b.2.

"The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact." LR 56.b. Plaintiff's resistance did not include a response to Defendants' statement of facts, leaving them admitted. *See Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032-33 (8th Cir. 2007). Indeed, there does not appear to be much dispute about the facts put forward by Defendants.[2]

The Court is aware that summary judgment is rarely appropriate in employment discrimination cases and should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hildman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998). Because employment discrimination cases are often based on inferences, "'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999) (quoting *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 486-87 (8th Cir. 1998)). However, "the plain language of Fed. R. Civ. P. 56(c)[56(a) post-12/1/10] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

[2] In fairness, both sides failed to fully comply with LR 56. They did not file or cite to the required appendix. LR 56.a.4, .b.4, .e.

case, and on which that party will bear the burden of proof at trial." *Rensink v. Wells Dairy, Inc.*, ___ F. Supp. 2d ___, ___, 2010 WL 3767154, *9 (N.D. Iowa Sept. 15, 2010).

## II.

## FACTUAL BACKGROUND

Ms. Lattig was an employee of the Winterset Madisionian Inc. dba *The Shopper*, owned by Mr. Gorman. *The Madisionian* is a weekly newspaper, and *The Shopper* is a free handout containing advertisements. Ms. Lattig was hired to work at *The Shopper* in 1973 by previous owners. Mr. Gorman began working for his father at *The Madisionian* in 1975, and he purchased the entire business in 1989. *The Madisionian* acquired *The Shopper* in 1979. Ms. Lattig continued to work for *The Shopper* after the acquisition, and she reported to Mr. Gorman. Ms. Lattig did not have a written or oral employment contract and was an at-will employee.

Ms. Lattig was born March 15, 1939. By all accounts, Ms. Lattig was a loyal, hardworking, and trusted employee. She began as a data processor advancing to head bookkeeper and office manager. She suffered from a stroke in January 1998, after which she was hospitalized for six weeks. Ms. Lattig received pay and benefits during her hospitalization, and she returned to work after six weeks. As a result of the stroke, Ms. Lattig uses a cane to walk and has limited function of her left side, which caused her to perform some of her duties of employment more slowly. For example, she was unable to use her left hand to operate accounting devices.

Sometime after Ms. Lattig's stroke, Mr. Gorman began working from home and stopped coming into the office. He frequently communicated by telephone and email with the office staff. With Mr. Gorman working from home, Ms. Lattig thought she had been delegated greater responsibility running the office. Ms. Lattig and Mr. Gorman had a cordial working relationship, and she did not have any problems with Mr. Gorman's personality. Ms. Lattig never saw Mr. Gorman mistreat any employee, and Mr. Gorman never said anything to Ms. Lattig to make her believe he was treating her differently after her stroke. In preparing the business's 2006 tax return, Ms. Lattig overstated gross revenues by approximately $90,000.00 in the year end report given to Becky Kyle, the company's CPA, a mistake which, when discovered, gave Mr. Gorman some concern.

At the end of her employment, Ms. Lattig was making $520.00 per week.[3] She took vacation time starting October 18, 2007. She planned on taking a week off, but on October 24, 2007, Mr. Gorman called and told her to extend her vacation by a week because of the amount of vacation time she had accrued and because

[3] There is some dispute regarding whether Ms. Lattig was an hourly employee making $13.00 per hour or a salaried employee. She did not receive overtime pay for working more than 40 hours per week, which she frequently did. Ms. Lattig did not report her hours to Mr. Gorman, and she never discussed with him receiving overtime pay. Ms. Lattig issued her own paychecks using a signature stamp of Mr. Gorman's signature.

he wanted to look over the accounting books.[4] Stacey Naber was a part-time assistant bookkeeper and was doing the bookkeeping while Ms. Lattig was on vacation. While Ms. Lattig was gone, Mr. Gorman wanted to have another employee, Vickie Polk, audit the accounting books. Ms. Naber refused to give Ms. Polk passwords to access the contents of the bookkeeping files on the computer used by Ms. Lattig. Mr. Gorman believed that Ms. Lattig and Ms. Naber were working together to prevent Ms. Polk from reviewing the bookkeeping. Ms. Lattig felt that Mr. Gorman was questioning her honesty by wanting to have someone else look at the books.

Ms. Lattig's daughter, Pam Shady, worked for Defendants for a period of time, but quit prior to October 2007 and took a job with Wells Fargo.[5] Mr. Gorman testified he heard rumors that Ms. Shady had a key and was accessing the cash register. This concerned Mr. Gorman because Ms. Shady was not on the payroll. While Ms. Lattig was taking vacation time, Mr. Gorman had the locks changed to the room where the bookkeeping was done. Ms. Naber and Ms. Lattig had a conversation about the locks being changed on October 19, 2007. During that conversation, Ms. Lattig told Ms. Naber to put Ms. Lattig's belongings located in the bookkeeping room in a

---

[4] Ms. Lattig had accrued vacation hours that she would lose if she did not use them within the year.

[5] Ms. Lattig's deposition testimony conflicts with Mr. Gorman's deposition testimony with regard to when Ms. Shady worked for Defendants and who hired her.

box. Ms. Lattig did not discuss with Mr. Gorman why he had the locks changed or whether she would receive a key to the room, but she felt she was being demoted and thought Mr. Gorman might terminate her employment.

On November 1, 2007, Mr. Gorman sent an email to Ms. Lattig, Ms. Polk, and Ms. Naber, stating as follows:

> Dear Shirley, Vickie, and Stacey:
>
> Effective this morning 11-2-07, I have the following instructions for you:
>
> 1. Vickie Polk and Stacey Naber will perform all bookkeeing input.
> 2. We need Shirley to provide direction and assistance to Vickie P. and Stacey.
> 3. Shirley should set up a desk outside the bookkeeping room.
> 4. Shirley should be helpful to everyone around the office, and she should help with ad-layout, assist customers and promote the welfare of the Winterset Madisionian and Shopper.
> 5. Contact me when questions or issues arise.
> 6. Shirley will provide direction and assistance to Vickie and Stacey as needed.
> 7. Shirley's hours of work will be Monday, Tuesday, Thursday, Friday 9am - 12:30pm and 1pm - 4:30pm. Wednesdays off to catch up on vacation. Shirley's pay will be $12.70 per hour with a weekly cap of 28 hours.
> 8. Vickie, Stacey, and Shirley should work with Tish to set up new software.
>
> Best regards,
> Ted Gorman

(Def. Ex. C [9-2] at 56). Mr. Gorman testified that he intended the changes discussed in the email would be temporary.

On the morning of November 2, 2007, Ms. Naber called Ms. Lattig and read Mr. Gorman's email to her. Ms. Lattig told Ms. Naber to pack up Ms. Lattig's belongings for her to pick up. Ms. Lattig's feelings were hurt. She did not contact Mr. Gorman on November 2, 2007. Ms. Lattig took all of her belongings and did not return to work on November 2, 2007 or thereafter. Mr. Gorman terminated her effective November 2, 2007. *See* Pl. Resist., Ex. 1 [10-1] at 28-29).

Ms. Lattig sent a certified letter to Mr. Gorman dated November 27, 2007, stating as follows:

> Hi Ted,
>
> This is to let you know I will not accept your proposal as of Nov. 2nd, but I would consider coming back doing the office manager/bookkeeper work as before for The Shopper-40 hours a week at $13.00 per hour. I could start at anytime. I had intended on working 2-3 more years.
>
> I would also like to meet with you and discuss this. Let me know.
>
> Best Regards,
> Shirley Lattig

(Pl. Resist., Ex. 1 [10-1] at 60).

Mr. Gorman called Ms. Lattig on December 7, 2007. He told her he had not forgotten about her, and he stated that he needed to make some changes and would get back to her. Ms. Lattig and Mr. Gorman have not communicated since that conversation. Ms. Lattig never complained to Mr. Gorman that she felt like she was being discriminated against based on her age, sex, or disability.

Ms. Naber, age about 32 at the time, testified at Ms. Lattig's unemployment compensation hearing that after Ms. Lattig was terminated she took over her job for a brief period of time. Ms. Naber quit on about November 16, 2007. Ms. Polk was then assigned the bookkeeping duties. Ms. Polk was in her late forties with unspecified physical impairments. Mr. Gorman also hired Deb Bridger to assist with bookkeeping.

In her sworn unemployment compensation hearing testimony, Ms. Naber said that shortly after he hired her in 2006 Mr. Gorman approached her about taking over Ms. Lattig's job, telling her Ms. Lattig was "old and feeble and that his CPA's were on his butt to get her out of there." (Pl. Resist., Ex. 1 [10-1] at 36).[6] According to Ms. Naber, Mr. Gorman thereafter continued to make comments to her that Ms. Lattig was old and feeble as he pressured Ms. Naber to take over Ms. Lattig's job. (*Id.* at 37-38). Mr. Gorman offered Ms. Lattig's job to Ms. Naber while Ms. Lattig was on vacation in October-November 2007. (*Id.* at 38). In his deposition testimony, Mr. Gorman denied making the statements Ms. Naber attributed to him. (Def. Ex. B [9-2] at 34-35).

[6] Ms. Naber said much the same thing in an unsworn letter both parties have included in their motion papers. (Pl. Unnum. Ex. [10-1] at 7; Def. Ex. E [9-3] at 4).

**III.**

**DISCUSSION**

**A. Title VII and ICRA**

Among other things Title VII prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e-2. It does not, however, address employment discrimination on the basis of age and disability. Age discrimination is covered by the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq*. and disability discrimination by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*. Ms. Lattig has not brought suit under either the ADEA or ADA. The only federal claims expressly pleaded by Ms. Lattig are her Title VII sex discrimination and associated retaliation claims.

ICRA is broader than Title VII in that it is inclusive of all forms of employment discrimination including on the basis of age, sex and disability. Iowa Code § 216.6(1)(a). Iowa courts look to federal case law under Title VII, the ADEA and ADA, for guidance when deciding cases under ICRA. *See Fuller v. Iowa Dep't of Human Services*, 576 N.W.2d 324, 329 (Iowa 1998)("In considering a disability discrimination claim brought under Iowa Code chapter 216, we look to the ADA and cases interpreting its language."); *Beard v. Southern Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001) ("We evaluate [the plaintiff's sex discrimination] claims under Title VII and under the Iowa Civil Rights Act using the same legal

principles."); *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n.2 (8th Cir. 2000)("The ICRA is interpreted to mirror federal law, including the ADEA."); *Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999)("The discrimination claims alleged under the Iowa Civil Rights Act are analyzed in the same manner as their federal counterparts.").

An employment discrimination case may survive summary judgment in one of two ways under both Title VII and ICRA. The plaintiff may produce what is generally referred to as "direct evidence" of discrimination, that is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 (8th Cir. 2008); *see Humphries v. Pulaski County Special School Dist.,* 580 F.3d 688, 692 (8th Cir. 2009); *Russell v. City of Kansas City*, 414 F.3d 863, 866 (8th Cir. 2005); *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 893 (Iowa 1990). Cases founded on direct evidence implicate the "mixed motives" framework derived from the plurality opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), in which direct evidence shifts the burden of persuasion to the employer to establish it would have made the same decision anyway. *See Gross v. FBL Financial Serv., Inc.*, 588 F.3d 614, 620 (8th Cir. 2009); *Landals*, 454 N.W.2d at 893-94.

Alternatively, if direct evidence is unavailable, as is usually the case, the plaintiff may create an inference of unlawful discrimination by employing the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and discussed further in the next subsection. *Humphries*, 580 F.3d at 692; *Fields*, 520 F.3d at 863-64; *see Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005); *Casey's General Stores, Inc. v. Blackford*, 661 N.W.2d 515, 520 & n.3 (Iowa 2003).

**B. Sex Discrimination**

Ms. Lattig has not argued her sex discrimination claim in resisting the motion for summary judgment, and for good reason. She has presented no direct evidence that her gender played a part in the decisions made by Mr. Gorman which led to her termination. She must rely on the *McDonnell Douglas* framework, under which the plaintiff initially bears the burden of proving a prima facie case of discrimination. *See Cronquist v. City of Minneapolis*, 237 F.3d 920, 924 (8th Cir. 2001)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the plaintiff establishes a prima facie case, "a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee." *Id.* If the employer articulates a legitimate nondiscriminatory reason, the plaintiff bears the burden of putting forward evidence that the employer's asserted reason is merely pretextual. *Id.; see Humphries*, 580 F.3d at 692-93.

To make out a prima facie case, the employee must establish (1) the employee was a member of a protected class; (2) the employee was qualified to perform the job; (3) the employee suffered an adverse employment action; and (4) it is more likely than not the adverse action was based on an improper motive, such as sex. *Hamer v. Iowa Civil Rights Com.*, 472 N.W.2d 259, 264 (Iowa 1991). Ms. Lattig's sex discrimination prima facie case falters at the fourth element. She was replaced by a woman. The work force was overwhelmingly female, twenty of twenty-eight employees. (*See* Def. Ex. F [9-3] at 6-7). There is a complete absence of any other facts in the record which could give rise to an inference of sex discrimination. The Court will enter summary judgment in Defendants' favor on Ms. Lattig's Title VII and ICRA sex discrimination claims.

**C. Age Discrimination**

Because Ms. Lattig has not alleged a claim under the ADEA, her age discrimination claim is solely under the ICRA. While Iowa courts have historically looked to federal ADEA law in interpreting age discrimination claims under ICRA, *see Fisher*, 225 F.3d at 919 n.2, recent U.S. Supreme Court case law revisiting the ADEA has resulted in an ADEA causation standard which has not been adopted by the Iowa Supreme Court for ICRA cases.

In *Gross v. FBL Fin. Servs.*, ___ U.S. ___, ___, 129 S. Ct. 2343 (2009), the U.S. Supreme Court held that the Title VII

"mixed motives" analytical alternative does not apply to ADEA cases and that the plain language of the statute requires a "but-for" causation standard under which the burden of persuasion does not shift to the employer when direct evidence of age discrimination is presented. *Id.* at ___, 129 S. Ct. at 2250-52. The Eighth Circuit has since said that Iowa Supreme Court precedent would indicate the holding in *Gross* does not alter the causation standard or affect the "mixed motives" inquiry for age cases under ICRA. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982-83 (8th Cir. 2010)(citing *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009)); *see Gross*, 588 F.3d at 620 (*Price Waterhouse* mixed-motives analysis continues to apply under ICRA). Thus, the net result is that the rules have not changed under ICRA; a plaintiff may present direct evidence under the mixed-motives framework or indirect evidence under the pretext, or burden-shifting, framework. *See Woehl v. Hy-Vee, Inc.*, 637 F. Supp. 2d 645, 650-51 (S.D. Iowa 2009).

Viewing the evidence favorably to Ms. Lattig, as the Court must, and giving her the benefit of every reasonable inference, the Court finds she has presented direct evidence of age discrimination. Mr. Gorman, the owner of the company, was the sole decision maker. The direct evidence comments are his. If Ms. Nabers is believed, shortly after she was hired in 2006 Mr. Gorman talked to her about taking over Ms. Lattig's job telling Ms. Naber Ms. Lattig was old and feeble. He later continued to make these

comments as he pressed Ms. Naber to take the job. In context a reasonable fact finder could conclude that Mr. Gorman told Ms. Naber on more than one occasion that he wanted Ms. Naber to take over Ms. Lattig's job because he viewed Ms. Lattig as old and feeble. The jury could reasonably consider that when Ms. Lattig went on vacation in October-November 2007 Mr. Gorman took steps to replace Ms. Lattig with the much younger Ms. Naber and Ms. Polk as he had intended. Seen in this light, the statements attributed to Mr. Gorman are not stray remarks unrelated to the decisional process. *See Gross v. FBL Financial Services, Inc.*, 526 F.3d 356, 359 (8th Cir. 2008)(quoting *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring in the judgment), *rev'd on other grds.*, __ U.S. ___, 129 S. Ct. 2343 (2009).

Mr. Gorman vigorously denies having made the statements Ms. Naber attributes to him, and has offered legitimate nondiscriminatory reasons for Ms. Lattig's termination. If, however, the jury believes Ms. Naber and does not believe Mr. Gorman, the jury may reasonably find that age actually motivated the adverse employment decisions which resulted in Ms. Lattig's termination.

The evidence, viewed favorably to Ms. Lattig, does not compel the conclusion that the same decisions would have been made. *See Landals*, 454 N.W.2d at 893-94. It follows that the motion for

summary judgment on Ms. Lattig's age discrimination claim should be denied.

**D. Disability Discrimination**

Ms. Lattig's disability claim is not addressed much in the motion papers, by plaintiff barely at all. Defendants' principal arguments are that Mr. Gorman's "old and feeble" comments are not sufficient to generate a fact issue on motivation and Ms. Lattig has not shown she is "disabled" within the meaning of the law.

After her stroke Ms. Lattig had limited use of her left side and walked with a cane. It took her longer to do her work. As defendants' argument recognizes, the alleged "old and feeble" remarks of Mr. Gorman tend to combine the age and disability analysis. Ms. Lattig's disability discrimination claim is clearly the weaker of the two. The description of her as "feeble" is ambiguous because it may relate more to her age. Ms. Lattig's successful work for many years after her stroke without any unfairness having been shown to her tends to rebut both notions that she was substantially limited in the major life activity of working or that disability was a motivating factor for the much later employment decisions. On the other hand, the stroke seems to have left Ms. Lattig with significant and permanent physical impairments. The limited summary judgment record does not preclude the disabling effect of the impairments on other major life

activities besides work, particularly "walking." For this reason and the fact age and disability are arguably associated as motivating factors in the alleged direct evidence statements, the Court will allow the disability claim to go forward with the age claim.

**E. Retaliation**

While Ms. Lattig's Complaint pleads retaliation in violation of both Title VII and ICRA, she has not shown any evidence that she complained of age, sex or disability discrimination, otherwise opposed unlawful discrimination, or that the adverse actions she complains of were in any way connected to a charge or proceeding under Title VII or ICRA. *See* 42 U.S.C. § 2000e-3; Iowa Code § 216.11. Nor in resisting the summary judgment motion has she argued there is evidence which could support a retaliation claim. It follows summary judgment is appropriate on her retaliation claim.

## IV. CONCLUSION

Defendants' motion for summary judgment [9] is **granted** with respect to Plaintiff's Title VII and ICRA sex discrimination claims and all of her retaliation claims. It is **denied** with respect to Plaintiff's ICRA age and disability discrimination claims. Three years after the events in issue and with trial near, the Court will retain supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3). This case will proceed to trial

solely on Plaintiff's ICRA age and disability discrimination claims.

IT IS SO ORDERED.

Dated this 23d day of December, 2010.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE